**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| ORMAT NEVADA INC., a Delaware Company<br>6884 Sierra Center Pkwy<br>Reno, NV 89511<br><br>ORNI 32 LLC, a Delaware Limited Liability Company<br>6884 Sierra Center Pkwy<br>Reno, NV 89511<br><br>     Plaintiffs,<br><br>        v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the Interior<br>The Department of the Interior<br>1849 C Street NW<br>Washington, DC 20240<br><br>The DEPARTMENT OF THE INTERIOR<br>1849 C Street NW<br>Washington, DC 20240<br><br>BRIAN NESVIK, in his official capacity as Director of U.S. FISH AND WILDLIFE SERVICE<br>1849 C Street NW<br>Washington, DC 20240<br><br>U.S. FISH AND WILDLIFE SERVICE<br>1849 C Street NW<br>Washington, DC 20240<br><br>     Defendants. | Case No. 1:25-CV-_____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Ormat Nevada Inc. and ORNI 32 LLC (collectively, "Ormat") bring this action for

declaratory and injunctive relief against the Secretary of the Interior (the "Secretary"), the

Department of the Interior (the "Department"), the Director of the U.S. Fish and Wildlife Service ("Service" or "FWS"), and the Service (collectively, "Federal Defendants"):

## INTRODUCTION

1.      Without any evidence that the Dixie Valley toad is in decline, the Service issued an emergency rule, and then a final rule, under the Endangered Species Act ("ESA"), adding the toad to the list of endangered species.

2.      The Service's actions were prompted by special interest group Center for Biological Diversity ("CBD"), which has engaged in a decade-long campaign to use the ESA to prevent construction of a geothermal power plant proposed to develop existing federal geothermal lease rights in Churchill County, Nevada.

3.      CBD petitioned, and then sued, the Service to list the Dixie Valley toad as an endangered species.

4.      On February 22, 2022, the Service and CBD settled litigation related to the Service's delay in acting on CBD's petition.  The public settlement document announced CBD's belief that the toad was "imminently threatened by the Dixie Meadows Geothermal Utilization Project," which CBD baldly asserted would, "if constructed, irreparably alter the Dixie Valley toad's sole habitat and threaten the Dixie Valley toad with extinction."  The Service committed to issue a determination as to whether to list the Dixie Valley toad on or before April 4 of that year.

5.      When the settlement between the Service and CBD was signed, the Bureau of Land Management ("BLM") had already approved Plaintiff Ormat's Dixie Meadows Geothermal Utilization Project ("Project"), based in part on the agency's determination—supported by careful hydrological modeling and analysis—that the subsurface geothermal resource has little, if

any, connection to the wetlands occupied by the toad, such that Project operations, including the extensive aquatic resources monitoring and mitigation plan, were not expected to negatively impact the toad.

6.      Nevertheless, the Service issued an emergency rule granting the Dixie Valley toad "endangered" status on April 7, 2022, "due to the imminent development of a geothermal project in Dixie Meadows, Nevada, and the potential resulting effects to the geothermal springs relied upon by the Dixie Valley toad." 87 Fed. Reg. 20336 (Apr. 7, 2022) ("Emergency Rule").  It was the first emergency rule the Service had issued in over a decade.

7.      On December 2, 2022, the Service issued a final rule formally adding the Dixie Valley toad to the list of endangered species.  87 Fed. Reg. 73971 (Dec. 2, 2022) ("Final Rule").

8.      The Service violated the law by listing a species as endangered that, by the Service's own reasoning, was not in danger of extinction at the time of listing.

9.      The Service's decision was arbitrary and capricious because it cannot be reconciled with contrary information in the record before the agency.  The Service disregarded the best available scientific and commercial information about the technology to be deployed and the hydrology of the site, instead adopting CBD's worst-case assumptions based on consumptive use geothermal technology (not the Project's state-of-the-art re-injection technology) (1) that developing the geothermal resource might affect the water quality, quantity, or temperature in the wetlands where the Dixie Valley toad is found, (2) that any changes could not be mitigated, and (3) that any changes would in the future so materially and adversely affect the toad's habitat that it is currently in danger of extinction.

10.      Both the Emergency Rule and the Final Rule have caused concrete and particularized harm to Ormat, including by impairing its significant investment of time, money,

and other resources in a critically needed new renewable energy project in Churchill County, Nevada. In 2015, based on favorable exploration results, Ormat submitted an application to BLM to develop its leased federal geothermal resources. Ormat's Project was approved by BLM in November 2021 after a rigorous review. Yet initial construction on the Project was halted by an injunction, and even though the injunction was later vacated as improperly issued, the Service's actions have prevented Ormat from recommencing construction as of the filing of this complaint.

11.     Despite proposed changes, made in good faith, to address the Service's concerns in the consultation process, BLM has yet to approve or deny Ormat's pending application in over three years, and the Service has failed to articulate the species' needs in a way that impacts from the Project—if any—can be evaluated.

12.     In short, the Service's failure to follow the law, failure to consider the best evidence, and its reliance on an insufficient record in issuing the Emergency and Final Rules has indefinitely prevented Ormat from completing construction of this renewable energy project. A declaration that the Federal Defendants are in violation of the ESA and APA, vacatur of the listing of the Dixie Valley toad as an endangered species, and a prohibition on the enforcement or implementation of the Final Rule would address that significant harm and allow construction to proceed.

13.     Ormat therefore requests that the court vacate the Final Rule listing the Dixie Valley toad as an endangered species and enjoin the Federal Defendants from implementing, enforcing, or relying on the Final Rule.

## JURISDICTION AND VENUE

14.     This action arises under the ESA, 16 U.S.C. §§ 1531-1544, and the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  This Court has jurisdiction under

28 U.S.C. § 1331 (action arising under the laws of the United States); 16 U.S.C. § 1540(g)(1)(C)

(citizen suit action against the Secretary for failure to perform nondiscretionary duty under

Section 1533); 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed

plaintiff); and 5 U.S.C. §§ 701–706 (APA).

15.     An actual controversy exists between the parties within the meaning of 28 U.S.C.

§ 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant

to 16 U.S.C. § 1540(g)(4), 28 U.S.C. §§ 1361, 2201–2202 and 5 U.S.C. §§ 705–706.

16.     Venue is proper under 28 U.S.C. § 1391(e)(1) as this civil action is brought

against an agency of the United States and officers and employees of the United States acting in

their official capacities and under the color of legal authority, and at least one of the defendants

is a resident of the District of Columbia and a substantial part of the events giving rise to the

claims occurred in the District of Columbia.

17.     The challenged actions are subject to judicial review under 16 U.S.C. § 1540(g)

and 5 U.S.C. §§ 702, 704, and 706.

## PARTIES

18.     Plaintiff ORMAT NEVADA INC. is a Delaware corporation with its headquarters

located in Reno, Nevada.  Ormat has applied to develop its geothermal rights through the Dixie

Meadows Geothermal Utilization Project.  Despite receiving approval from BLM, Ormat has

been unable to construct the Project because of regulatory delay caused by the Emergency Rule

and Final Rule listing of the Dixie Valley toad.  After the toad was listed, Ormat in good faith

proposed changes to the Project that would provide even more protections for the toad, but the changes led to BLM rescinding its approval for the Project as originally designed.  BLM has spent years engaged with the Service on how to evaluate the proposed changes.

19.     Plaintiff ORNI 32 LLC owns federal geothermal leases in the Combined Dixie Meadows Geothermal Unit Area (NVN-89456X).  Ormat Nevada Inc. directly owns 100% of ORNI 32 LLC.

20.     Defendant DOUG BURGUM, United States Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior and, in that capacity, is ultimately responsible for implementing and complying with federal laws governing authorization of geothermal utilization permits, including the ESA.  He is sued in his official capacity.

21.     Defendant U.S. DEPARTMENT OF THE INTERIOR, is the department within the executive branch with supervisory control over the Service and that is responsible for implementing and complying with federal laws, including the ESA.

22.     Defendant BRIAN NESVIK, Director of the Service, is ultimately responsible for assuring lawful implementation of the ESA for amphibian species.  He is sued in his official capacity.

23.     Defendant U.S. FISH AND WILDLIFE SERVICE ("Service") is a federal agency within the U.S. Department of the Interior that is responsible for implementing the Secretary's obligations under the ESA.

## FACTUAL ALLEGATIONS

### I.     Endangered Species Act

24.     Under the ESA, a species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A species is

6

"threatened," as opposed to endangered, when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

25.    The Secretary is to make an endangered or threatened determination "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A).

26.    "The purpose of the best available science standard is to prevent an agency from basing its action on speculation and surmise." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (citations omitted).

27.    The Secretary must determine whether a species is endangered or threatened upon considering the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purpose; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1).

28.    The ESA explicitly requires the Service to provide "a summary . . . of the data on which [any] regulation is based" and to "show the relationship of such data to such regulation[.]" 16 U.S.C. § 1533(b)(8).

29.    Relying on scientific uncertainty to justify a listing decision abrogates the Service's obligation for reasoned decision-making. *See Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 585 (D.C. Cir. 2023). "[W]hen faced with uncertainty," the Service "may not" "give the 'benefit of the doubt' to an endangered species by relying on worst-case scenarios or pessimistic assumptions." *Id.*

30.     A final decision to list a species under the ESA must articulate a rational connection between the facts found and the conclusions made.  *In re Polar Bear Endangered Species Listing*, 709 F.3d 1, 8, 10, 17 (D.C. Cir. 2013); *see also* 16 U.S.C. § 1533(b)(4).

31.     Where uncertainties exist regarding the species and its habitat needs or the extent of current or potential influences on the species, the Service may not make unsupported assumptions that the species is in danger of extinction.  "It is not enough for the Service to simply invoke 'scientific uncertainty' to justify its action." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011).

**II.    Administrative Procedure Act**

32.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action."  5 U.S.C. § 702.  Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court."  *Id*. § 704.

33.     Under the APA, agency actions may also be set aside where the action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law."  *Id*. § 706(2)(C)–(D).

34.     To survive review under the APA's arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (internal quotations omitted).  An agency action is arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the project of agency expertise."  *Id.*

### III.     Dixie Valley Toad

35.     Dixie Valley toad (*Anaxyrus williamsi*) is a small toad found in the Dixie Meadows wetlands in Churchill County, Nevada.

36.     The Dixie Valley toad was historically considered to be part of the Western toad species (*A. boreas*).  The alleged differentiation of the Dixie Valley toad as a separate species occurred nine years after the area in and around the Dixie Meadows wetlands had already been leased for geothermal development.

37.     Despite listing the toad as an endangered species, proposing critical habitat for the toad, and conducting multiple species status assessments, the Service has repeatedly acknowledged that the agency knows little about the toad's life history, population size, and habitat needs.  No information exists that indicates the Dixie Valley toad population is in decline.

### IV.     The Project

38.     The geothermal resource in the vicinity of the Dixie Meadows is in federal ownership and leased to Ormat as the Combined Dixie Meadows Geothermal Unit Area (NVN-89456X).  The Combined Dixie Meadows Geothermal Unit Area was consolidated in 2012 from preexisting leases.

39.     Beginning around 2010 and extending through 2017, Ormat conducted geothermal exploration in the Project area, authorized by BLM, including drilling nine exploration wells, and conducting a 46-day flow and injection test from April 27 to June 11, 2017.  The exploration was intended to delineate the geothermal resource and determine whether the Project would be technically and economically feasible.

40.     In 2015, based on favorable exploration results, Ormat submitted a formal application to the BLM to construct and operate up to two 30 megawatt ("MW") (60 MW total) closed-loop binary technology geothermal power plants, the ("Project").  The closed-loop binary

technology proposed for the Project a non-consumptive technology in which the extracted geothermal fluid is used to heat a separate motive fluid in a heat exchanger and then returned to the geothermal reservoir.

41.     BLM analyzed the application pursuant to the National Environmental Policy Act ("NEPA") in a 2021 Environmental Assessment.

42.     BLM approved the Project in a Decision Record, including a rigorous aquatic resources monitoring and mitigation plan, dated November 23, 2021.

43.     Project opponents, including CBD, sued, seeking a preliminary injunction to block the Project.  At a court hearing on the motion for preliminary injunction, counsel for the plaintiffs indicated that they had reason to believe FWS would soon list the Dixie Valley toad.

44.     Ormat began site-preparation activities and initial construction, but those activities were blocked by a partial preliminary injunction issued at the request of CBD and other Project opponents.  That preliminary injunction was subsequently vacated by the U.S. Court of Appeals for the Ninth Circuit.

**V.     The Regulatory Process Resulting in the Decision to List the Dixie Valley Toad.**

45.     Beginning in April 2017, Ormat conducted a 46-day flow test to evaluate the long-term geothermal reservoir performance and suitability for commercial development, as well as potential impacts to surface water systems in the vicinity,  including the wetlands occupied by the Dixie Valley toad.  Two days before the flow test was complete, CBD sent a notice of its intent to submit an "emergency" petition to list the Dixie Valley toad, claiming that it was a "newly described species" facing an "impending threat" from the Project.

46.     On September 18, 2017, CBD submitted a petition to list the Dixie Valley toad as a threatened or endangered species.  Although there is no regulatory pathway for an

"emergency" petition, CBD requested "emergency listing" "at the soonest possible time, in light of the impending threat of geothermal energy production in its range."

47.    The CBD Petition presented little information about the status of the Dixie Valley toad.  CBD admitted that "[t]here are no current estimates of the Dixie Valley toad's population abundance and structure," and speculated based upon the size of the known habitat that the population was "small."  The CBD Petition did not include any evidence indicating a decline in the Dixie Valley toad population.

48.    On June 27, 2018, FWS announced that it had determined the CBD Petition presented substantial scientific or commercial information indicating that listing the Dixie Valley toad "may be warranted."  Specifically, the Service noted threats to the species due to "[d]evelopment of geothermal energy and difficulty in associated mitigation, changes in water temperature, and groundwater extraction" and "chytridiomycosis disease and predation by the invasive American bullfrog."  83 Fed. Reg. 30091, 30093 (June 27, 2018).

49.    In the same notice, the Service announced it would be initiating a status review of the Dixie Valley toad and solicited "any new information concerning the status of, or threats to" the toad. *Id.*

50.    The Service did not make public progress on the Dixie Valley toad status review for three and a half years.

51.    CBD sued the Service in February 2020 to force the agency to act on its petition. The lawsuit resolved via stipulated settlement on February 22, 2022, which recited CBD's belief that the Project threatened the Dixie Valley toad.  In the settlement, the Service committed to complete its review of the species and issue a finding on whether listing was warranted by April 4, 2022.

52.     On April 7, 2022, FWS announced its "12-month" finding that CBD's petition was "warranted" and announced a proposed rule to list the Dixie Valley toad as an endangered species. 87 Fed. Reg. 20374 (Apr. 7, 2022). FWS simultaneously issued the Emergency Rule, temporarily listing the Dixie Valley toad as endangered.

53.     The proposed rule announced the Dixie Valley toad was a "listable entity" even though one of the two papers studying the population "stopped short of concluding that it is a unique species." *Id.* at 20375.

54.     The proposed rule did not provide details on the basis for listing, referring readers to the temporary Emergency Rule published the same day. In the Emergency Rule, FWS temporarily listed the Dixie Valley toad as an endangered species for 240 days "[d]ue to the imminent development of a geothermal project in Dixie Meadows, Nevada, and the potential resulting effects to the geothermal springs relied upon by the Dixie Valley toad." 87 Fed. Reg. 20336 (Apr. 7, 2022).

55.     The Emergency Rule analyzed the redundancy, representation, and resilience, of the Dixie Valley toad, noting that although population estimates were "not available," occupancy studies indicated that adult Dixie Valley toads "currently have high occupancy and are generally more likely than not to occur across the Dixie Meadows wetlands." *Id.* The Emergency Rule concluded that the "high occupancy rate observed from 2018 through 2021 and evidence of reproduction observed in the period 2009-2021 suggest that that the Dixie Valley toad is currently maintaining resilience to the historical and current environmental stochasticity present at Dixie Meadows." *Id.* at 20342.

56.     Notwithstanding the conclusion that the toad's population showed no signs of decline but rather, high occupancy, the Emergency Rule speculated that the Dixie Valley toad

"has low potential to adapt to a fast-changing environment," and "depends entirely on the continued availability of habitat in Dixie Meadows." *Id.*

57.    The Emergency Rule acknowledged that distinct types of geothermal development exist and accurately identified that Ormat had proposed using binary cycle technology.  The Emergency Rule, however, did not acknowledge that the state-of-the-art binary cycle technology planned for the Project is designed to prevent impacts to groundwater by maintaining the temperature and pressure of the geothermal reservoir.

58.    However, the Service's assessment of the impacts of geothermal development did not distinguish between observed impacts of binary cycle technology and other kinds of geothermal technologies and instead appeared to attribute all observed impacts to all potential technologies.  The Emergency Rule asserted that "[s]team discharge, land subsidence (i.e., gradual settling or sudden sinking of the ground surface due to the withdrawal of large amounts of groundwater), and changes in water temperature and flow"—all impacts associated with consumptive geothermal steam technology—"have all been documented from geothermal production assets throughout the western United States." *Id.* Of the four prior geothermal developments cited as examples, only one (Jersey Valley) used binary cycle technology.

59.    The Emergency Rule relied heavily on the results of an "Expert Knowledge Elicitation Workshop" held on August 17-20, 2021 ("Workshop"), which predicted that "the Dixie Meadows spring system will change quickly, and detrimentally, once geothermal production begins." *Id.* at 20343.

60.    The Workshop was a facilitated group video conference discussion based upon an "evidence dossier" prepared by the Service that purported to "synthesize[] relevant literature"

and the Project.  Ormat was not invited to provide information regarding its Project, the baseline
exploration it had completed, or its hydrogeologic modeling, as part of the Workshop.

61.     The Emergency Rule further claimed that "robust baseline environmental
information" was lacking such that FWS doubted the "ability of the [mitigation plan] to detect
changes in baseline conditions and mitigate those changes."

62.     The Emergency Rule asserted that "Although there is large uncertainty in the
magnitude of expected changes from the approved project, there is a high degree of certainty that
geothermal energy development will have severe and negative effects on the geothermal spring
relied upon by the Dixie Valley toad, including reductions in spring temperature and spring flow,
which directly affect the resource needs of the species." *Id.*  The Emergency Rule went on to
identify "plausible" changes that could result. *Id.*

63.     The Emergency Rule included numerous technical and factual errors, which
Ormat identified in public comments on the rule and in consultation with FWS regarding the
Project.  On June 6, 2022, Ormat submitted comments on the Service's April 7, 2022 emergency
listing decision.

64.     Ormat's public comments challenged the Service's lack of supporting data and
pessimistic assumptions about (1) the possible hydrological connection between the subsurface
geothermal resource and the surface waters inhabited by the Dixie Valley toad, (2) the possibility
that the Project will interfere with that connection, (3) the scope of such interference, if it
materialized, on surface water temperature, quantity, and/or quality, (4) Ormat's ability to detect
and mitigate any such impacts, as required by BLM, and (5) the Dixie Valley toad's ability to
adapt to any such impacts.

65.    On December 2, 2022, FWS issued the Final Rule adding the Dixie Valley toad to the list of endangered species.

66.    Disregarding factual corrections on material points in Ormat's comment letter, the Service concluded in the Final Rule that the Project—which at that point had undergone material design changes and ongoing delays due to the Section 7 consultation process initiated when the toad was listed under the Emergency Rule—nevertheless presented an imminent, existential threat to the Dixie Valley toad such that it warranted listing as an endangered species.

67.    On March 22, 2023, Ormat provided its notice of intent to sue under the ESA's citizen suit provision (Exhibit A) to the Secretary and the Service via email and certified mail.

68.    Neither the Secretary nor the Service has responded to Ormat.

69.    Instead, the Service has moved forward with developing a recovery plan, despite admitting that it lacks critical information needed to assess the species' needs—i.e., the "conditions . . . that will allow Dixie Valley toads to persist long-term in their only habitat in Dixie Meadows."

70.    The Service also proposed to designate critical habitat for the toad despite knowing so little about the species' needs that it could not identify with precision what elements of habitat were "critical" for the species and was forced to rely on vague terms such as "diverse wetland vegetation," "open ephemerally wetted areas," water temperatures within an undefined "natural range," the undefined "natural range of variability of water extent found throughout each wetland," undefined "water quality necessary to sustain natural physiological processes," and a "variety of aquatic and terrestrial invertebrates, detritus, and algae for feeding."  89 Fed. Reg. 46838 (May 30, 2024).

## VI.    The Service's Basis for Listing the Dixie Valley Toad as an Endangered Species.

71.    The primary threat identified in the Final Rule listing the Dixie Valley toad is geothermal development, which the Service assumed could so severely and rapidly change the water temperature, quantity, and/or quality of the surface waters inhabited by the toad that one or more of these parameters would fall outside the range in which this resilient species could survive.

72.    The Service reached its decision that the Project would endanger the toad by referencing impacts from geothermal projects that used dramatically different technology than is planned for the Project.

73.    Of the Projects cited by the Service's Workshop and repeated in the Final Rule as alleged comparators, most are steam plants that result in consumptive water use—easily distinguished from the Project.  Ormat's state-of-the-science binary technology avoids consumptive use and instead recycles the geothermal fluid back to the reservoir for reheating. Not only does this technology sustain the amount of geothermal fluid in the natural reservoir, but it also maintains the pressure of the geothermal system.  Binary cycle technology also avoids harms cited in the Emergency Rule such as steam discharge and land subsidence.

74.    The only Project cited in the Final Rule and considered by the Workshop that uses binary technology is Ormat's Jersey Valley plant.  Although the Service acknowledged that "every geothermal field is unique," it consistently pointed to the Jersey Valley project (1) as evidence that the Dixie Valley Project has similar hydrogeologic characteristics, (2) as evidence the Project will cause the springs to cease flowing, (3) as a justification for its low confidence in Ormat's monitoring and mitigation, (4) as support for the expert panel's timeline of expected impacts for the Project, and (5) as justification for the expert panel's lack of confidence in Ormat's aquatic resources monitoring and mitigation plan.

16

75.     The Service did not address Ormat's comments that the Jersey Valley project had a key distinguishable circumstance, in that shortly after geothermal production began at the plant, injected fluids began to surface from a nearby improperly plugged and abandoned mineral exploration borehole (drilled 20 years earlier by a different company).  Once aware of the issue, Ormat immediately stopped using its nearby injection well, which may have reduced reservoir pressure and led to water failing to surface at the nearby small (35 to 75 gallons per minute) Jersey Valley Hot Spring.  The situation in Dixie Meadows is not analogous because the production and injection wells have already been flow tested.

76.     Nor did the Service consider information Ormat provided in comments regarding other binary technology projects that did not have negative effects.  Ormat pointed the Service to three projects where geothermal development has not affected aquatic surface resources.  The Service declined to consider them because, it claimed that unlike those projects, "the Dixie Meadows springs are not hydraulically isolated from the underlying geothermal reservoir by one or more low permeability layers." 87 Fed. Reg. at 73979.

77.     The Service's assertion that the Dixie Meadows springs are hydraulically connected to the underlying geothermal resource is inconsistent with site-specific well bore data demonstrating that the geothermal reservoir targeted for development in Dixie Valley is capped by a low permeability layer, and that geothermal input to the springs instead comes from lateral flow through the shallow alluvium originating from upwellings along the eastern flank of the Stillwater Range of mountains west of the springs, which accounts for the lack of observable impacts to the springs during the 46-day flow test.  Thus, the Service's assertion about hydraulic connection is at odds with the best available science established in the record about the characteristics of the area.

78.    The Service ignored site-specific well and flow test data that supported BLM's and Ormat's conceptual hydrogeological model and demonstrated that the deep geothermal reservoir for Project development is not directly connected to the Dixie Meadows springs complex.  Instead of crediting this site-specific data, the Service based its decision on a feeling that it was "not a coincidence" that the springs lie above the Piedmont fault that runs north to south through Dixie Valley, which in the Service's view must be the source of geothermal fluid at the springs.  The Service's alternate hypothesis regarding the role of the Piedmont fault has not been verified by the exploration drilling conducted to date.

79.    The Service acknowledged that there is a large variation in temperature throughout the springs complex and estimated that geothermal fluids make up, at most, 30% of the water in the springs complex.  Therefore, even in the worst-case scenario, the Service projected 70% of the water in the springs would be unaffected by the Project.  The Service further does not explain how a possible variation in the temperature of 30% of the water flowing into the springs would be noticeable or impactful to the Dixie Valley toad, and the toad's resilience to temperature variation is a characteristic the Service deemphasized without explanation.

80.    Although the Service acknowledged in the Final Rule that it initially misstated hydrogeological aspects of the Piedmont fault near the springs complex and that there may be input to the springs from the west to east shallow flows, the Service maintained its conclusion that the Project is a threat to the toad because "significant uncertainty remains regarding the primary and/or significant source or sources of the thermal springs." *Id.* at 73977.

81.    The Service further speculated about harms from possible urban and municipal water development, disease transmission and predation from distant bullfrog populations, and

climate change without considering evidence regarding the likelihood of any one of these threats

actually impacting the Dixie Valley toad or the toad's resilience to these factors. Instead, the

Final Rule asserts without explanation that the species that it otherwise characterizes as

"resilient" to environmental changes nonetheless has a "low potential to adapt to environmental

changes to its habitat." *Id.* at 73986.

**VII.    Impact of Listing Decision on Ormat.**

82.    The Service's hurried process to issue the Emergency Rule, followed by the Final

Rule, prevented Ormat from completing construction of the Project. Upon receiving approval to

begin construction, Ormat promptly began site-clearance. The Project is not located in the

wetlands occupied by the toad (but rather near an existing road and transmission line), and Ormat

took appropriate precautions to prevent potential impacts to the wetlands where the toad might

be found.

83.    Project opponents, including CBD, obtained a partial preliminary injunction from

a district court, which prevented Ormat from moving beyond site-clearance and initial

construction activities. By the time the U.S. Court of Appeals for the Ninth Circuit vacated the

preliminary injunction as improper, the Service had issued the Emergency Rule, which triggered

an obligation for BLM to consult on impacts to the toad pursuant to ESA Section 7, 16 U.S.C. §

1536(a)(2).

84.    Ormat participated in consultation in good faith and proposed additional, material

changes to the Project to address the Service's concerns in the consultation process. These

material changes prompted BLM to rescind its original approval for the Project to conduct a new

analysis of the significantly revised project. However, in over three years since the Emergency

Rule, little progress has been made on the consultation, and BLM has yet to approve or deny

Ormat's pending application.  To date, the Service has been unable to articulate the species' needs such that the impacts of the Project on the species, if any, could be evaluated.

85.    Ormat is concerned that the current consultation process could take three to five years before reaching a decision on whether Ormat may move forward with the Project.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violation of ESA and the APA – Failure to Act in Accordance with Law)**

86.    Ormat incorporates the prior allegations as if fully set forth herein.

87.    The ESA defines an "endangered species" as a species that "is in danger of extinction."  16 U.S.C. § 1532(6).  A "threatened species" is one that is likely to become endangered within the foreseeable future."  16 U.S.C. § 1532(20).

88.    Where uncertainties exist regarding the species and its habitat needs or the extent of current or potential influences on the species, the Service may not make unsupported assumptions that the species is in danger of extinction.  "It is not enough for the Service to simply invoke 'scientific uncertainty' to justify its action." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011).

89.    Relying on scientific uncertainty to justify a listing decision abrogates the Service's obligation for reasoned decision-making.  *See Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 585 (D.C. Cir. 2023).  "[W]hen faced with uncertainty," the Service "may not" "give the 'benefit of the doubt' to an endangered species by relying on worst-case scenarios or pessimistic assumptions." *Id.*

90.    When listing the Dixie Valley toad, the Service did not make a finding that the species faced extinction at that time.  The Service did not cite evidence of current habitat loss or changes in population health or numbers.

91.     The Final Rule relies, almost exclusively, on the Service's concern that future operation of the Project could adversely affect the species.

92.     The Final Rule does not meet the statutory standard for designating a threatened species because it does not establish a timeframe constituting the "foreseeable future" for the toad.

93.     Instead, the Service assumed that the "Dixie Valley toad will have no ability to withstand stochastic . . . events" such that any change in the Dixie Meadows would cause the toad's extinction. 87 Fed. Reg. at 73990.

94.     By failing to apply the correct definitions of "endangered" or "threatened" species, the Service failed to perform a non-discretionary action in promulgating the Final Rule, which must therefore be vacated.

95.     For the same reason, the Service acted in an arbitrary and capricious manner, abused its discretion, and acted otherwise not in accordance with law, entitling Ormat to the relief requested below.

## SECOND CAUSE OF ACTION
### (Violation of ESA and the APA – Failure to Consider Best Available Scientific and Commercial Information)

96.     Ormat incorporates the prior allegations as if fully set forth herein.

97.     The Secretary must make the determination of whether a species is endangered or threatened by considering the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purpose; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.  16 U.S.C. § 1533(a)(1).

98.     In doing so, "[t]he ESA requires an agency to use 'the best scientific and commercial data available,'" and "[a]n agency's failure to do so [also] violates the APA." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (citations omitted).  The Service cannot "disregard available scientific evidence that is in some way better than the evidence it relies on." *Id.* (cleaned up).

99.     The Service failed to consider the best available scientific and commercial data throughout the Final Rule.  For example, the Service rejected site-specific wellbore data and flow test data that supported BLM and Ormat's conceptual hydrogeological model and demonstrated that the deep geothermal reservoir for Project development is not directly connected to the Dixie Meadows spring complex.  Notwithstanding this data, the Service maintained that "significant uncertainty remains regarding the primary and/or significant source or sources of the thermal springs." 87 Fed. Reg. at 73977.

100.     The Service rejected Ormat's comments that the agency should use as comparators three modern geothermal projects using the same binary technology proposed at the Project that had not affected surface aquatic resources because the Service incorrectly asserted that "the Dixie Meadows springs are not hydraulically isolated from the underlying geothermal reservoir by one or more low permeability layers" even though the best available science indicated that the Dixie Meadows springs are hydraulically isolated. *Id.* at 73979.

101.     Nor did the Service address Ormat's comments on why site-specific conditions at the single binary technology geothermal project the Service used as a comparator—in particular a previously unknown improperly plugged and abandoned mineral exploration borehole— resulted in adverse impacts that were unlikely to occur at Dixie Meadows given the results of the Project's flow test.

102.    The Service further entirely disregarded the extensive aquatic resources monitoring and mitigation plan proposed as part of the Project.  Instead of explaining why the best available science demonstrated that the Project's mitigation was likely to fail or demonstrating why the small amount of water potentially affected by the Project likely would impact the toad to the point of threatening its survival, the Service cited to prior literature that asserts broadly, without consideration of the binary technology proposed to be used that the Project, that geothermal development in general presents the "greatest threat to the persistence of the Dixie Valley toad" and speculated against available evidence that Ormat would decline to take appropriate mitigation actions.

103.    Accordingly, the Service in listing the Dixie Valley toad failed to consider the best available scientific and commercial information in violation of the ESA, rendering the agency's listing decision arbitrary and capricious under the APA, and entitling Ormat to the relief requested below.

### THIRD CAUSE OF ACTION
**(Violation of ESA and the APA – Failure to Consider All Relevant Factors and Provide a Rational Explanation for the Agency Action)**

104.    Ormat incorporates the prior allegations as if fully set forth herein.

105.    A final Service listing decision is required to articulate a rational connection between the facts found and the conclusions made.  *In re Polar Bear Endangered Species Listing*, 709 F.3d 1, 8, 10, 17 (D.C. Cir. 2013); *see also* 16 U.S.C. § 1533(b)(4).  An agency action is arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the project of agency

expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted). The Service may not disregard available facts and "base its listings on speculation or surmise." *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246–47 (D.C. Cir. 2001).

106.    The Service insists the Dixie Valley toad lacks resilience to changes in its environment despite numerous pieces of evidence to the contrary. The Final Rule acknowledges that toads are "maintaining resilience to the historical and current environmental stochasticity," but does not explain how that historic resilience to environmental changes to its habitat translates to a "low potential to adapt to environmental changes to its habitat" that might result from the Project, including its planned mitigation. 87 Fed. Reg. at 73896.

107.    The Service speculated that urban and municipal water development could affect the Dixie Valley toad but failed to adequately address comments demonstrating that neither risk is likely to occur because of Federal land withdrawals and water basin over-appropriation.

108.    The Service speculated about risk from disease and predation without explaining how transmission would occur when the nearest chytridomycosis-infected bullfrogs are 10 km from the Dixie Meadows spring complex, and the Service provided no explanation of how an infected bullfrog would travel such a distance across Nevada desert and live long enough to successfully infect or prey on the Dixie Valley toad. The Service has acknowledged that the Dixie Valley toad is rarely observed more than 14 meters from the wetted areas of the Dixie Meadows wetlands; thus the only risk of infection or predation would occur from chytridomycosis-infected toads occupying the Dixie Meadows wetlands.

109.    The Service further speculated that climate change will negatively affect the Dixie Valley toad's habitat by decreasing precipitation and therefore spring flow but failed to explain

how the negative effect would occur when the Service's own data projects an increase in precipitation at the site. Nor does the Service explain how the alleged climate change threat is consistent with its statement elsewhere in the record that "the degree to which springflows are affected by climate change largely depends on influences on surface water processes and precipitation." Species Status Assessment at 49, 52.

110.    The Service failed to articulate a reasoned explanation for its determination that the Project threatens the Dixie Valley toad, when even in the worst-case scenario used by the Service, 70% of the water in the springs would be unaffected by the Project. The Service further does not explain how a possible variation in the temperature of 30% of the water flowing into the springs would be noticeable or impactful to the toad, let alone such an impact that would place the toad in danger of extinction.

111.    Finally, the Service failed to sufficiently consider and respond to Ormat's comments, which raised many of these concerns.

112.    Based on the above and for other reasons that may be apparent in the administrative record, the Service failed to articulate the required rational connection between the facts before the agency in the administrative record and the decision reached to list the Dixie Valley toad, rendering the Service's decision arbitrary and capricious under the APA and entitling Ormat to the relief requested below.

## **PRAYER FOR RELIEF**

WHEREFORE, Ormat respectfully requests that the Court:

A.    Declare that the Federal Defendants are in violation of the ESA and APA.

B.    Vacate the rule listing the Dixie Valley toad as an endangered species.

C.    Enjoin the Federal Defendants from enforcing or implementing the Final Rule.

25

D.      Issue such additional relief as Ormat subsequently requests or that this Court may

deem just, proper, and equitable.

Dated this 30th day of September, 2025.

/s/ Sarah C. Bordelon

Sarah C. Bordelon
Holland & Hart LLP (D.C. Bar No. 987135)
5441 Kietzke Lane, Second Floor
Reno, NV  89511
Telephone: (775) 327-3000
scbordelon@hollandhart.com

Hadassah M. Reimer (U.S.D.C. D.C. Bar No. WY002)
P.O. Box 68
Jackson, WY  83001
Phone: (307) 739-9741
Fax: (307) 739-9744
hmreimer@hollandhart.com

**ATTORNEYS FOR ORMAT NEVADA INC.**

# EXHIBIT A



March 22, 2023

**VIA EMAIL AND CERTIFIED MAIL**

Secretary Debra A. Haaland          Director Martha Williams
U.S. Department of the Interior     U.S. Fish & Wildlife Service
1849 C Street NW                    U.S. Department of the Interior
Washington, DC 20240                1849 C Street NW
doiexecsec@ios.doi.gov              Washington, DC 20240
                                    Martha_Williams@fws.gov

     **Re:**     **Sixty Day Notice of Intent to Sue for Violations of the Endangered Species Act; Improperly Determining Endangered Status for Dixie Valley Toad (*Anaxyrus williamsi*)**

Dear Secretary Haaland and Director Williams,

     On behalf of Ormat Nevada Inc. ("Ormat"), we inform you of our intent to file a civil suit against the Secretary of the Interior and the U.S. Fish and Wildlife Service (the "Service") for violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44, concerning the Service's listing of the Dixie Valley Toad ("DVT" or the "toad") as endangered, 87 Fed. Reg. 73,971, 73,986 (Dec. 2, 2022), despite evidence that the species is not *currently* in danger of extinction. In making that listing, the Service failed to consider the best available scientific and commercial information regarding Ormat's Dixie Valley Geothermal Project (the "Project") operations and the hydrogeological character of the Dixie Valley springs. Instead, the Service at every turn and without substantiation assumed the worst-case scenario and listed the toad as endangered. The Service's assumptions and uninformed projections violate the ESA.

     This letter is provided to you pursuant to the 60-day notice requirement of 16 U.S.C. § 1540(g)(2)(C). Ormat intends to file suit seeking declaratory and injunctive relief, as appropriate, to correct and enjoin the continued actions by the Service in violation of the ESA and its implementing regulations. The Service failed to follow its own regulations when it improperly listed the toad as endangered. Pursuant to 16 U.S.C. § 1540(g)(4), we will also seek legal fees and costs associated with this action. This correspondence details only those violations of the ESA requiring pre-suit notice. Ormat may assert additional claims or causes of action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, or other applicable statute, regulation, or law, including additional ESA violations.

**ORMAT TECHNOLOGIES, INC.**
6140 Plumas St., Reno, NV  89519-6075, USA  •  +1-775-356-9029  •
ormat@ormat.com                                                   ormat.com



## I.    Background

### A.    Ormat's Interests in the Listing Decision

Ormat operates several geothermal energy production facilities in Nevada. Ormat has a significant interest in the listing of the DVT as endangered because it implicates Ormat's planned Project in Dixie Valley. The Project will produce clean geothermal energy for Nevada. That Project has been significantly delayed and its construction and operations have been modified (and are likely to be further modified) as a result of the listing. Further, Ormat committed to taking substantial steps to preserve the toad's habitat during the construction and operation of the Project and is correspondingly committed to the toad's preservation. Nonetheless, the Service identified Ormat's planned Project as the largest threat to the Dixie Valley toad in the Service's listing decision. But the Service's listing of the toad was based on an outdated Project design, inflated possible harms, and disregard for Ormat's mitigation plan. The resulting decision directly and significantly affects Ormat's proposed Project and misconstrues the Project under construction as a current threat to the toad.

### B.    The Dixie Valley Toad

The DVT was historically considered part of the Western toad species (*A. boreas*). It was determined to be a unique species in 2017. This differentiation occurred nine years after the area in and around the Dixie Meadows springs was leased for geothermal development, seven years after Project exploration began, and the same year public comment opened on the Project's draft Environmental Assessment. The DVT is demonstrably smaller than other Western toads but limited additional information is known of their population or life history. *Special Species Assessment ("SSA")* at 14, 16, U.S. FISH & WILDLIFE SERVICE (Dec. 1, 2022).

What *is* known about the toad is that it is only currently known to exist in the 122-spring Dixie Meadows complex within Dixie Valley in Churchill County, Nevada. Dixie Meadows springs are varied in "temperatures and water chemistry," which "depend[] on where the water is originating from and potentially mixing." *Id.* at 19. Despite this variation, "[a]dult toads currently have high occupancy rates and are generally more likely than not to occur across the Dixie Meadows wetlands." Endangered Species Status for the Dixie Valley toad, 87 Fed. Reg. 73,971, 73,986 (Dec. 2, 2022). The toad has thus far "maintain[ed] resilience to the historical and current environmental stochasticity present at Dixie Meadows." *Id.*

### C.    Listing Decision Procedural History

On December 2, 2022, the Service listed the toad as endangered under the ESA. *Id.* at 73,989. The final listing rule followed the Service's earlier April 7, 2022 emergency listing decision, 87 Fed. Reg. 20336, and proposal for a final listing rule, 87 Fed. Reg. 20374. The Service's listing rationale was based primarily on the Bureau of Land Management's ("BLM") approval of and the forthcoming



construction and operation of Ormat's Project. As originally approved in November 2021, the Project would produce 60 MW of energy from federal leases in the vicinity of the toad's habitat in Dixie Meadows springs.

Ormat submitted comments on the Service's April 7, 2022 emergency listing decision on June 6, 2022, and, along with BLM, participated in ESA Section 7 consultation with the Service. Ormat identified during that consultation that the Service, and its expert panel review, erroneously relied on dated Project documents that materially differed from the actual Project approved in November 2021. After Ormat submitted its comments on the emergency listing, Ormat decided to reduce the Project size and output by 80% to facilitate the newly initiated Section 7 consultation process between BLM and the Service. In October 2022, Ormat formally submitted a proposal to BLM for an amended authorization, and BLM issued a new Decision Record on December 16, 2022, rescinding the 60 MW project authorization and limiting the Project to approximately 12 MW. The Service was aware of and participated in discussions regarding the reduced Project size. But again, without regard to the Project documentation and reduced total Project capacity of 12 MW, the Service issued its final listing decision on December 2, 2022, retaining its reliance on the defunct pre-authorization Project documents and evaluating the impacts of a Project capacity of 60 MW.

### D.    Endangered Species Act

Under the ESA, a species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened," as opposed to endangered, when it is "*likely to become* an endangered species within the *foreseeable future* throughout all or a significant portion of its range." 16 U.S.C. § 1532(20) (emphases added). The Secretary is to make an endangered or threatened determination "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species …." 16 U.S.C. § 1533(b)(1)(A).

The Secretary must consider the following factors in determining whether a species is endangered or threatened: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purpose; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1). The ESA explicitly requires the Service to provide "a summary ... of the data on which [any] regulation is based" and to "show the relationship of such data to such regulation[.]" 16 U.S.C. § 1533(b)(8). An agency action is further required to articulate a rational connection between the facts found and the conclusions made. *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005); *see also* 16 U.S.C. § 1533(b)(4).

As detailed herein, the listing of the DVT as an endangered species violates the ESA. The toad does not meet the definitional standard for a threatened—let alone endangered—species, and the Service



failed to base its decision on the best scientific and commercial data available. The data on which the Service did rely does not support the Service's conclusions, and the Service ultimately failed to consider a number of relevant factors.

## II.    The Service Violated the ESA

### A.    The Service's Listing of the Dixie Valley Toad Failed to Meet the ESA's Definitional Standard for Either an Endangered or Threatened Species

To be eligible to be listed as endangered, as opposed to threatened, a species must be *currently* facing extinction. The language of the statute is clear: it requires the Service to find that the species "***is*** in danger of extinction." 16 U.S.C. § 1532(6) (emphasis added). But the DVT does not currently face extinction—the Service cites no evidence of current habitat loss or changes in population health or numbers. Instead, the listing decision is based almost entirely on the anticipated construction and potential effects of *future* operations of Ormat's Project. 87 Fed. Reg. at 73,972. Even at the time of the Service's expert panel review in August 2021, the Project was proposed for completion at least a year after authorization. Final EA at 2-6. The Final Decision Record also added a phased development requirement that mandated Ormat to install a comprehensive ground and surface-water monitoring system, collect 12 months of monitoring data prior to operations, and operate the Project at 12 MW for at least 12 months without exceeding monitoring thresholds before any future development would be considered and permitted by BLM. Listing a species as currently endangered before any change in the species status is extremely uncommon and unsupported by the record here.

Even if the Service had concluded that the toad is only "*likely to become* endangered in the foreseeable future," and therefore qualified as a threatened species, that finding too is unsupported by the record. The Service did not establish a timeframe constituting the "foreseeable future" for the toad and instead asserted that any changes due to the Project at any time to the Dixie Valley Springs would cause the toad's extinction. But the cited research demonstrates the toad's environment varies across the springs complex in both temperature and water quality and the toad is found throughout the complex. Despite this natural variation, the Service assumed "Dixie Valley toads will have no ability to withstand stochastic … events." *SSA* at 57. The Service cannot take every unknown about a species and assume, without a rational basis, that the unknowns would all contribute to the species' extinction. "It is not enough for the Service to simply invoke 'scientific uncertainty' to justify its action." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011). The Service cannot rest on lack of knowledge about the toad and a misapprehension of the future impacts of Project to determine that the toad is *currently* at risk of extinction to support an "endangered" listing or will be in the foreseeable future to support a "threatened" listing.



**B.    The Service Failed to Base the Listing Decision on the Best Scientific and Commercial Data Available**

"The ESA requires an agency to use 'the best scientific and commercial data available,'" and "[a]n agency's failure to do so [also] violates the APA." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (citations omitted). The Service cannot "disregard available scientific evidence that is in some way better than the evidence it relies on." *Id.* (cleaned up). But here, the Service was repeatedly informed that it was relying on outdated information about the Project and its Aquatic Resources Monitoring and Mitigation Plan ("ARMMP"), yet it declined to consider the available, updated, and "best" information.

**1.    The Service Ignored the Phased Development of the Project and Based the Listing on a Project Capacity Five Times Greater Than the Final Approved Project.**

The expert panel relied on information from January 2021 and made its projections based on the assumption that Ormat would simultaneously operate two 30 MW geothermal power plants. In turn, the Service's Species Status Assessment ("SSA") and listing decision relied on the opinions of the expert panel. This approach disregarded the BLM's Decision Record that authorized a phased Project development approach that requires (1) installation of a comprehensive groundwater and surface-water monitoring system, (2) collection of 12 months of monitoring data prior to operations, and (3) operation of the Project at 12 MW for at least 12 months without exceeding monitoring thresholds before any future development would be considered and permitted.

The Service claims that the expert panel took phased development into account as part of its review, but this is demonstrably incorrect. BLM itself only considered phased development later in the process in response to comments and after the expert panel concluded its work. Moreover, the Service affirmed in the final rule that its listing was based on full Project production, claiming that "[e]ven if development is phased, the total production amount approved [of 60 MW] remains a relevant quantity for assessing risk." 87 Fed. Reg. 73,976. The Service's failure to adequately consider the phased Project development is ironic given that its own expert panel, apparently unaware of the actual approved plan, recommended at the end of its analysis that Ormat schedule the Project "in a stepped phase"—or, exactly how it was approved. *SSA*, App. C ("Elicitation Record") at 41 (Aug. 2021). Failing to consider available Project information violates the ESA because "an agency may not entirely fail to develop appropriate projections where data 'was available but [was] simply not analyzed.'" *NRDC v. Kempthorne*, 506 F. Supp. 2d 322, 359 (E.D. Cal. 2007) (citation omitted).

Even if the Service considered the phased Project implementation, the Service's final rule entirely ignored Ormat's proposal to reduce the Project size to 12 MW. Ormat formalized its proposal to reduce the Project size from 60 MW to 12 MW, giving up 80% of its capacity, in a letter request to BLM in October 2022. Ormat's proposal and BLM's commitment to evaluate and make a decision by the end

of 2022 were both made part of the record before the U.S. District Court for the District of Nevada in filings in October 2022. Indeed, as a result of Ormat's proposal, BLM rescinded the 60 MW Project approval and issued a new one for 12 MW on December 16, 2022, just days after the final listing rule. Though the smaller Project was not approved until after the final listing rule, the Service was aware of the imminent change and wholly ignored it. The Service failed to consider these developing circumstances in its final decision, instead basing the listing on an expert panel review of a 60 MW project that no longer exists. The Service continued to rely on the 60 MW Project in the final listing rule, claiming that "the total production amount approved [of 60 MW] remains a relevant quantity for assessing risk," although the impacts of the 12 MW project phase "will differ greatly" from the 60 MW phase that the Service assumed would eventually be developed. 87 Fed. Reg. 73,976. To the contrary, there is no longer a 60 MW Project and any assessment of risk associated with a Project five times larger than the approved Project capacity is completely irrelevant. This ignored information only reinforces Ormat's arguments regarding the Service's failure to apply the definitional requirements—a 60 MW Project cannot currently threaten the DVT because it literally does not exist. Thus, the Service failed to consider the best commercial information available, in violation of the ESA.

### 2.    The Service Improperly Ignored or Discounted the Effectiveness of the Aquatic Resources Monitoring and Mitigation Plan.

The Service knowingly relied on an expert panel review that, in turn, based its opinions on an earlier version of the Project's ARMMP even after BLM and Ormat notified the Service of substantial changes to the final ARMMP addressing the Service's specific criticisms. The expert panel repeatedly expressed concerns about the number of monitoring sites around the Dixie Valley spring complex, Elicitation Record at 11, 16–17, 40, and the frequency of BLM's review of the data generated by monitoring, *id.* at 11, 16–17, 19, 40–41. BLM and Ormat directly responded to those comments by increasing the number of monitoring sites and committed to weekly data measurement at all sites in the November 2021 ARMMP. Despite this update, the Service repeated in the final rule its original statement that the ARMMP only provided "limited monitoring locations" and continued to assume that no mitigation would ever be implemented as a result of the increased monitoring. 87 Fed. Reg. 73,971, 73,989. The Service and its experts' concerns were based on a different ARMMP and the Service failed to take into account the best scientific data available within the November 2021 ARMMP. Where the Service "selectively relied on … data and failed to consider and evaluate the contrary data … or adequately explain, in the SSA or 12-Month Finding, why they were disregarded," the Service violated the ESA and the APA. *WildEarth Guardians v. Haaland*, 561 F. Supp. 3d 890, 901 (C.D. Cal. 2021).

### C.    The Service Failed to Demonstrate a Relationship Between the Data Underlying the Listing and the Regulation Adopted

"In light of the data available to it during the rulemaking process," the Service must have a "rational and reasonable basis" for its conclusions based on the data. *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016); 16 U.S.C. § 1533 (the listing must include "a description and



evaluation of the reasons and data on which the finding is based"). The facts must support the agency's conclusions, and the Service's selective use of data, or reliance on substantial uncertainty does not support an endangered finding.

### 1.    There is no Evidence of the Likelihood of Urban or Water Development.

In the Listing, the Service leaps to conclusions by citing possible harms, but then fails to substantiate how that harm could actually come to pass and impact the DVT. The Service cites to the possibility of urban and municipal water development impacting Dixie Valley but fails to adequately address comments that both "risks" have almost no possibility of impacting the springs. 87 Fed. Reg. 73,974–75. No urban development can occur in Dixie Valley due to Federal land withdrawals, and the water basin is similarly over-appropriated such that further water development is highly unlikely. The Service does not explain how abstract hypothetical harms, with little or no chance of occurring, result in the current endangered status of the species, or even a finding that the species is "likely to become" endangered in the foreseeable future.

### 2.    The Service Relied on Uncertainty and Failed to Consider Site-Specific Well Data.

The Service ignored site-specific well and flow test data that supported Ormat and BLM's conceptual hydrogeological model and demonstrated that the deep geothermal reservoir for Project development is not directly connected to the Dixie Valley spring complex. Instead of crediting this site-specific data, the Service based its decision on a feeling that it was "not a coincidence" that the springs lie above the Piedmont fault that runs north to south through Dixie Valley, which in the Service's view *must* be the source of geothermal fluid at the springs. But the data is clear that there is no permeable zone in the Piedmont fault beneath the springs, and geothermal input to the springs instead comes from lateral flow through the shallow alluvium originating from upwellings along the eastern flank of the Stillwater Range west of the springs. *See* Final EA, App'x L at L-4 to L-6; *id.*, App'x M at M-4 ("the tracers added to the injection water … did not indicate a hydraulic connection between injection wells and spring sources that were monitored").

The Service's attempt to discount the value of the 2017 flow test, 87 Fed. Reg. at 76,976, is unconvincing given that the production and injection wells tested are the precise wells that will be utilized for the 12 MW facility, and the lack of any observed impact to the springs during the 46-day flow test is the best available scientific evidence demonstrating a lack of direct connection between the deep geothermal reservoir and the shallow springs. The flow test itself contributed to BLM's hydrogeological model, which was also built on existing hydrological and geological datasets from numerous studies of the Dixie Valley over the past 35 years. *See* ARMMP at 6. The flow test confirmed the model's prediction that the deep geothermal reservoir is not directly connected to the springs and that the springs will not be impacted by geothermal production. *See* Final EA at 3-35 (observing that the test indicated "there were no apparent influences of pumping and injection activities observed at [the



springs]"); *id.* App. H, Hydrogeologic Conceptual Model, App. D at D-5 ("Geochemical and stable isotope data suggests that there is not a direct hydraulic connection between the geothermal reservoir and the springs ....").

Although the Service acknowledges in the final rule that it initially misstated hydrogeological aspects of the Piedmont fault near the springs complex, 87 Fed. Reg. at 73,971, 73,978, and that there may be input to the springs from the west to east shallow flows, *id.* at 73,978, the Service holds fast to the conclusion that "significant uncertainty remains regarding the primary and/or significant source or sources of the thermal springs." *Id.* at 73,977. This alleged "uncertainty" cannot survive in the face of actual data pointing to the shallow source and lack of direct connection between the springs and the deep geothermal reservoir. At the very least, the "significant uncertainty" does not substantiate the certainty with which the Service concludes that geothermal production will immediately (or even foreseeably) impact the Dixie Valley springs.

Even the data that the Service did rely on fails to support the Services' hydrogeological conclusions. The Service acknowledged that there is a large variation in temperature throughout the springs complex and estimated that geothermal fluids make up, at most, 30% of the water in the springs complex. Elicitation Record at 28. Therefore, even in the worst-case scenario, the Service projected 70% of the water in the springs would be *unaffected* by the Project. In other words, spring flows will continue—they are not anticipated to dry up. The Service further does not explain how a possible variation in the temperature of 30% of the water flowing into the springs would be noticeable or impactful to the DVT, and the toad's resilience to temperature variation is a characteristic the Service deemphasized without explanation. *See infra* Section II.D.1. Instead, the Service simply assumes catastrophe.

### 3. The Service Disregarded the Mitigation Plan and Made Incorrect Assumptions Regarding Dissimilar Geothermal Projects.

The Service explicitly did not evaluate the ARMMP's various mitigation measures, Elicitation Record at 12, which include directly addressing a change in temperature by pumping hot water into the springs. Instead of explaining how the Project's mitigation could fail or demonstrating why the small amount of potentially affected water could impact the toad, the Service cited to prior literature that asserts broadly, without foundation, that geothermal development as a concept presents the "greatest threat to the persistence of the Dixie Valley toad." 87 Fed. Reg. 73971, 73984. The Service again identified information in the abstract but failed to reasonably connect those facts to the assumed outcome. The specific plans within the ARMMP to mitigate impacts to the Dixie Valley springs cannot be rebutted by general assertions of the danger of geothermal development or comparison to the impacts of other clearly distinguishable projects. Indeed, of the projects cited by the Service's expert panel review as alleged comparators in the proposed and final listing rules, most are steam plants that result in consumptive water use—easily distinguished from the Dixie Valley Project. Ormat's state-of-the-science binary technology avoids consumptive use and instead recycles the geothermal fluid back to the reservoir for



reheating.  Indeed, maintaining temperature and geothermal reservoir pressure are essential to the Project's success.

The only Project cited that uses binary technology is Ormat's Jersey Valley plant.  Although the Service prevaricated that "every geothermal field is unique," it consistently pointed to the Jersey Valley project (1) as evidence that *the Dixie Valley* Project has similar hydrogeologic characteristics, *id.* at 73,980, (2) as evidence the Project will similarly cause the springs to cease flowing, *id.* at 73,983–84, (3) as a justification for its low confidence in Ormat's monitoring and mitigation, *id.* at 73,988, (4) as support for the expert panel's timeline of expected impacts for the Project, Elicitation Record at 12, 29, and (5) as justification for the expert panel's lack of confidence in Ormat's monitoring plan, *id.* at 15, 42.  But as Ormat noted in its comments, the Jersey Valley project had a key distinguishable circumstance in that shortly after geothermal production began at the plant, injected fluids began to surface from a nearby improperly plugged and abandoned mineral exploration borehole (drilled 20 years earlier by a different company).  Once aware of the issue Ormat immediately stopped using its nearby injection well,[1] which may have reduced reservoir pressure and lead to water failing to surface at the nearby small (35 to 75 gallons per minute) Jersey Valley Hot Spring.  There is no risk of a similar occurrence in Dixie Valley where the production and injection wells for the 12 MW facility have already been flow tested.  Moreover, Jersey Valley did not include a robust and comprehensive ARMMP, as the Dixie Valley Project does.

At the same time that the Service relied heavily on a distinguishable project in Jersey Valley, it refused to consider the similarities between Ormat's Project and other binary technology projects that did not have negative effects.  Ormat pointed the Service to three projects where geothermal development has not affected aquatic surface resources.  The Service declined to consider them because, unlike those projects, "the Dixie Meadows springs are not hydraulically isolated from the underlying geothermal reservoir by one or more low permeability layers."  87 Fed. Reg. 73,971, 73,979.  To the contrary, the site specific well bore data demonstrates that the geothermal reservoir targeted for development in Dixie Valley here **_is_** capped by a low permeability layer, which accounts for the lack of observable impacts to the springs during the 46-day flow test.  *Also compare* Sorey 2000 at 707–08 (observing that the Coso Hot Springs were "traditionally utilized by local Native Americans" and correspondingly operated under "mitigation" requirements "in the event that geothermal development causes changes" to the springs and the result was "naturally occurring steam discharge has increased during [geothermal] development"), *with* 87 Fed. Reg. 73,971, 73,983 (listing three *other* projects discussed in the Sorey article that caused a reduction in nearby spring flow but did not have a referenced mitigation plan).

---

[1] Despite Ormat's prior immediate cessation of use of the injection well at Jersey Valley once it became aware of potential negative impacts to the Jersey Valley Hot Springs, the Service and its expert panel "question[ed] about the motivation to mitigate if measures ran counter to other operating goals of the plant."  87 FR 73971, 73987.  At Jersey Valley, Ormat demonstrated it will cease use of the injection well to protect the surrounding environment *even without an applicable mitigation plan*, directly countering the Service's negative insinuations regarding Ormat's motivation to implement this Project's mitigation plan.



Moreover, the Service fails to explain its assumptions that all of Ormat's mitigation will be ineffective or, more inexplicably, that Ormat's mitigation commitments are a sham because Ormat lacks the "motivation" to implement them. 87 Fed. Reg. 73,971, 73,987. The Service violates the ESA when its conclusion is not "rationally related to the data … presented" and fails to demonstrate that connection here. *Greenpeace v. Nat'l Marine Fisheries Serv.*, 237 F. Supp. 2d 1181, 1198 (W.D. Wash. 2002).

### D.    Failure to Comply with Required Listing Procedures by Considering Relevant Factors

The Service may not disregard available facts and "base its listings on speculation or surmise." *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246–47 (D.C. Cir. 2001). But here, the Service ignores evidence demonstrating the DVT is resilient and unlikely to incur infections from far-off bullfrog populations, and disregards that the only provided climate change evidence indicates expected changes will enhance the toad's environment rather than hurt it. Because "an agency 'cannot ignore available biological information'" the Service violated the ESA in listing the DVT. *Ctr. for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945, 971 (N.D. Cal. 2010) (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

### 1.    The Service Disregarded Toad Resilience Data.

The Service insists the DVT lacks resiliency to changes in its environment despite substantial evidence to the contrary. There is a large variation in water temperature and quality throughout the Dixie Valley Spring complex. 87 Fed. Reg. 73,971, 73,987. If all the identified toads were limited only to the warmest areas, the Service's assertion would appear more defensible. But the SSA evidence demonstrates that toads are found all over the complex, in warm and cool water, irrespective of poor water quality. *SSA* at 46 (Figure 4.7). This is consistent with other research finding Western toad species are generally highly resilient to changes in the environment. The Service acknowledges that toads are "maintaining resilience to the historical and current environmental stochasticity," but does not explain how that historic resilience translates to a "low potential to adapt to environmental changes to its habitat" that might be caused and mitigated by the Project. 87 Fed. Reg. 73,971, 73,986.

### 2.    The Service Overstated Chytrid Fungus and Climate Change Risk.

Aside from the Project, the Service identifies two other alleged risks to the DVT: infection from chytrid fungus and climate change. 87 Fed. Reg. 73,971, 73,989. But based on the Service's own evidence, the toad is unlikely to incur infections from far-off bullfrog populations and the only provided climate evidence indicates expected changes will enhance the toad's environment rather than hurt it. Regarding chytrid risk the Service admits in response to a comment that the only chytrid-infected bullfrogs are 10 km[2] from the Dixie Valley spring complex, but does not explain how a bullfrog would

---

[2] The Service alternately calculates 10 km as "6.2" miles and "5.7 miles." *Compare* 87 Fed. Reg. 73971, 73973 *with* 73990.



travel such a distance and live long enough to successfully infect the DVT.  87 Fed. Reg. 73,971, 73,973.  Furthermore, a review of the cited literature demonstrates that the bullfrogs were identified as chytrid-infected over a decade ago, and there is no evidence that the infection has spread or will spread.  *See* 87 Fed. Reg. 73,971, 73,990 (citing Forrest 2013); Forrest 2013 at 1 ("We surveyed populations of Dixie Valley toads between 2009–2012, and also tested individuals for [chytrid] in 2011–12.").

The Service further forecasts that climate change will negatively affect the DVT's habitat by decreasing spring flow, but substantiates that harm by identifying information that indicates climate change will *increase* precipitation.  The Service does not explain how a forecasted "annual precipitation … percent increases of 4.5 to 7.7 percent" will create a decrease in spring flows, particularly where the Service concedes that "the degree to which springflows are affected by climate change largely depends on influences on surface water processes and precipitation."  *SSA* at 49, 52.  The Service may be conflating a decrease in precipitation in another part of the Southwestern United States due to climate change and attributing it to the Dixie Valley springs complex.  In any event, the Service appears to have failed to consider its own data when reaching its conclusions that the DVT is at risk of chytrid infection and lowered spring flows due to climate change.

### 3.    The Service Failed to Respond to Comments.

Ormat raised many of these issues before the Service issued its decision, but the Service failed to sufficiently consider and respond to these comments.  Because 16 U.S.C. § 1533(b)(4) incorporates the APA requirements into the ESA process for issuing listing decisions, the Service's failure to adequately respond to Ormat's comments also violated the ESA.  *See* 5 U.S.C. § 553(b), (c).

## III.    Conclusion

The purpose of this notice letter is to afford the Department and the Service an opportunity to come into compliance with the ESA's requirements.  Please let us know if the Department and the Service intend to do so.

If the Department and the Service decline to do so, then they will be in continuing violation of the ESA's substantive and procedural requirements in listing the Dixie Valley Toad as endangered.  In that instance, Ormat intends to file suit in 60 days' time to challenge these deficiencies.  Please contact me with any questions concerning this notice and to discuss possible options to resolve the issues presented here without litigation.

Very truly yours,

Jessica Woelfel, General Counsel,
Chief Compliance Officer & Corporate Secretary

Secretary Debra A. Haaland, U.S. DOI
Director Martha Williams, U.S. FWS