**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ORMAT NEVADA INC., and              :
ORNI 32 LLC,                          :
                                    :
      Plaintiffs,                  :      Civil Action No.:    25-3512 (RC)
                                      :
      v.                          :      Re Document No.:   8
                                      :
U.S. DEPARTMENT OF THE        :
INTERIOR, *et al.*,               :
                                      :
      Defendants.               :

<u>**MEMORANDUM OPINION**</u>

**GRANTING CENTER FOR BIOLOGICAL DIVERSITY AND FALLON PAIUTE-SHOSHONE TRIBE'S
MOTION TO INTERVENE**

## I.  INTRODUCTION

In September 2025, Plaintiffs Ormat Nevada Inc. and ORNI 32 LLC, (collectively, "Ormat") filed suit against the Department of the Interior ("DOI"), Doug Burgum in his official capacity as Secretary of the Interior, the U.S. Fish and Wildlife Service ("Service"), and Brian Nesvik in his official capacity as Director of the Service (collectively, "Federal Defendants"), regarding the Service's final rule designating the Dixie Valley toad as an endangered species. The Dixie Valley toad's only habitat is within Dixie Meadows, Nevada, which is where Ormat seeks to construct and operate two geothermal power plants ("Project"). The Service cited Ormat's pending geothermal plants as a significant risk to the Dixie Valley toad because of the toad's reliance on the geothermal springs. In November 2021, before the final rule was implemented, the Bureau of Land Management ("BLM") approved Plaintiff's Project based on geothermal exploration studies of the Project's environmental impact. Ormat's Project was halted due to an injunction, which has since been lifted. Nevertheless, Ormat may not resume

construction because of the Service's final rule designating the Dixie Valley toad as an endangered species. Ormat alleges that the Service's decision to list the toad as an endangered species was arbitrary and capricious under the Administrative Procedure Act because it runs contrary to the best scientific information before the agency.

The Center for Biological Diversity ("Center") and Fallon Paiute-Shoshone Tribe ("Tribe") (collectively, "Defendant-Intervenors") move to intervene as defendants as a matter of right under Federal Rule of Civil Procedure 24(a), and, in the alternative, for permissive intervention under Rule 24(b). Ormat and Federal Defendants take no position regarding the motion to intervene. For the reasons stated below, the motion to intervene under Rule 24(a) is granted.

## II.  FACTUAL BACKGROUND

The Dixie Valley toad's (*Anaxyrus Williamsii*) ("toad") sole habitat is within the 760-acre Dixie Meadows thermal wetlands in Churchill County, Nevada. Mem. in Supp. Mot. Intervene ("Mot.") at 12, ECF No. 8. The toad maintains its lifecycle within the thermal springs of the wetlands, which allows the water to remain warm through the winter, preventing the toad from freezing. *Id.* at 13. The toad has survived in the Dixie Meadows for at least a thousand years by relying on the temperature balance between the cold shallow groundwater and hot geothermal water. *Id.*

The Tribe has regarded the toad as an important ancestor, and its home, the Dixie Meadows, is sacred to the Tribe. *Id.* at 12. The toad is "an inextricable element of Dixie Meadows" because it is the toad's only habitat in the world. Decl. of Catherine Williams-Tuni, Chairwoman of the Tribe ("Williams-Tuni Decl.") ¶ 8, ECF No. 8-3. For generations, the Tribe has worked to preserve its sacred sites, such as the Dixie Meadows. *Id* ¶ 16. The Tribe also

works to protect the toad and its habitat.  For example, the Tribe has sought help from the Navy to include the springs in its resource management plan.  *Id.* ¶ 17.  Additionally, the Tribe has used the Dixie Meadows for healing, spiritual contemplation, and ceremonies for countless generations.  *Id.* ¶ 9.  The wetland springs are encompassed by plants and muds that the Tribe uses for "ceremonial and medicinal purposes."  *Id.* ¶ 6.

The Center is an environmental non-profit with over 750 members in Nevada.  Decl. of Patrick Donnelly ("Donnelly Decl.") ¶ 6, ECF No. 8-1.  The Center uses science, law, and media to protect species on the verge of extinction.  *Id.*  The Center has years of experience protecting "ecosystems, species, water, and climate from inappropriate energy development on public lands."  *Id.*  Additionally, it conducts oversight on government actions and their associated environmental impacts.  *Id.* ¶ 8.  Besides its environmental work, Center members also enjoy recreational activities in the environments they protect.  *Id.* ¶ 10.  For instance, members regularly participate in "wildlife and native plant observation, nature photography, hiking, camping, backpacking, quiet and solitude in nature, dark skies, spiritual renewal, and a love of Nevada's natural landscapes."  *Id.*

In 2017, the toad received formal recognition as a unique species based on morphological and genetic differences from the broader western toad complex.  Donnelly Decl. ¶ 18; Ex. A to Mot. ("Listing Petition") at 7, ECF No. 8-4.  In September 2017, the Center petitioned the Service to list the toad as an endangered species so it could receive federal protection.  Donnelly Decl. ¶ 24.  To justify an endangered species designation, the petition cited Ormat's proposed geothermal plants as the principal threat to the toad and its habitat.  *Id.*  However, the Service did not rule on the petition by the statutory deadline.  Mot. at 14.  In February 2020, the Center filed suit against the Service because it failed to issue a timely decision regarding the petition.  *Id.*  In

February 2022, the Center and the Service entered a settlement whereby the Service agreed to make a final decision on or before April 4, 2022. *Id.* On April 7, 2022, the Service issued an emergency rulemaking listing the Dixie Valley toad as an endangered species and simultaneously issued a proposed rule to list the toad as an endangered species indefinitely. *Id.* at 14–15. In December 2022, the Service issued a final "Listing Rule" granting the Dixie Valley toad endangered species status and cited Plaintiff's Project as a risk for the toad's extinction. *Id.* at 15.

From 2010 through 2017—before the toad's formal recognition as a unique species—Ormat conducted geothermal exploration studies in the Dixie Meadows in preparation for its application to construct two 30 megawatt closed-loop binary technology geothermal power plants. Compl. ¶¶ 39–40, ECF No. 1. The study was authorized by the BLM, which included nine exploration wells and a 46-day flow and injection test from April 27 to June 11, 2017. *Id.* ¶ 39. In 2015, Plaintiff submitted a formal application to the BLM for its two geothermal plants in the Dixie Meadows. *Id.* ¶ 41. In November 2021, after its environmental assessment, the BLM approved Plaintiff's Project in a Decision Record, "including a rigorous aquatic resources monitoring and mitigation plan[.]" *Id.* ¶¶ 41–42.

However, because of the Listing Rule, Ormat cannot proceed with the Project and has filed suit against Federal Defendants to vacate the rule. *Id.* ¶¶ 12–13. On January 13, 2026, the Center and Tribe moved to intervene as defendants. Mot. at 1. The current parties have taken no position on Defendant-Intervenors' motion to intervene. Federal Defs.' Resp. to Mot. ("Federal Defs.' Resp.") at 1, ECF No. 9; Ormat's Resp. to Mot. Lift Stay & Mot. Intervene ("Ormat's Resp.") at 1, ECF No. 10.

### III. LEGAL STANDARD

The D.C. Circuit requires putative defendant-intervenors to demonstrate Article III standing by showing injury in fact, causation, and redressability.  *See Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 316 (D.C. Cir. 2015).  Additionally, courts in this Circuit require four elements for a party to intervene as of right under Rule 24(a): "1) timeliness of the application to intervene; 2) a legally protected interest; 3) that the action, as a practical matter, impairs or impedes that interest; and 4) that no party to the action can adequately represent the potential intervenor's interest." *Crossroads*, 788 F.3d at 320.  "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections."  *WildEarth Guardians v. Salazar*, 272 F.R.D. 4, 9 (D.D.C. 2010) (quoting *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001)).

### IV. ANALYSIS

The Court first analyzes Defendant-Intervenors' constitutional standing, and then whether they satisfy Rule 24(a)'s requirements for intervention as of right.  Because the Court concludes that Defendant-Intervenors are entitled to intervene as of right, it does not consider permissive intervention.

#### A. Standing

To intervene, Defendant-Intervenors must establish that they have Article III standing. "When an organization . . . seeks to establish Article III standing, it may . . . demonstrate that it has 'associational standing' to sue on behalf of its members." *Mayor of Baltimore v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 738 F. Supp. 3d 1, 7 (D.D.C. 2024) (citing *Public Citizen, Inc., v. Trump*, 297 F. Supp. 3d 6, 17 (D.D.C. 2018); and *Crossroads*, 788 F.3d at 316).

5

An organization has associational standing "if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted, nor the relief requested requires the member to participate in the lawsuit." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013)). As explained below, the Court concludes that Defendant-Intervenors have established associational standing.

First, Defendant-Intervenors must show that one of its members would have standing to sue in their own right. To do so, they must demonstrate that they would suffer an "injury in fact." *Farmer v. EPA*, 759 F. Supp. 3d 101, 108 (D.D.C. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In particular, "where a party seeks to intervene as a defendant to uphold an action taken by the government," as is the case here, "the party must establish that it will be 'injured in fact by the setting aside of the government's action it seeks to defend, that this injury would have been caused by that invalidation, and the injury would be prevented if the government action is upheld.'" *Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 11 (D.D.C. 2016) (quoting *Am. Horse Prot. Ass'n, Inc. v. Veneman*, 200 F.R.D. 153, 156 (D.D.C. 2001)).

In this lawsuit, Ormat seeks to vacate the Listing Rule designating the toad as an endangered species and proceed with the development of its geothermal plants in the Dixie Meadows. *See* Compl. ¶¶ 82, 112. If the Court grants this relief, Defendant-Intervenors' members would be injured because they currently benefit from the Listing Rule. *See Crossroads*, 788 F.3d at 317 (finding sufficient injury in fact "where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove

6

the party's benefit."). Currently, the Listing Rule grants the toad and its habitat federal protection. Without the Listing Rule, Plaintiff would proceed in constructing its geothermal plants in the Dixie Meadows to the toad's detriment. Mot. at 20. And Defendant-Intervenors' members have material "interests in protecting the toad and its unique thermal wetland habitat," such as "recreational, aesthetic, scientific, and professional interests in observing the toad in the wild." Mot. at 19–20. For example, Great Basin Director Patrick Donnelly and Chairwoman Catherine Williams-Tuni visit the Dixie Meadows to observe the toad in its habitat. Donnelly Decl. ¶ 16; Williams-Tuni Decl. ¶ 22. They both plan to regularly return to the Dixie Meadows, and an adverse ruling would diminish their enjoyment of the ecosystem, toad, and fauna. Mot. at ¶¶ 19–20. Therefore, Defendant-Intervenors' members have established an injury in fact, and in turn, causation and redressability. *See Crossroads*, 788 F.3d at 316 (finding that if defendant-intervenors have established an injury in fact for standing, then causation and redressability "rationally follow[]"). Indeed, the injury to Defendant-Intervenors members would materialize without the Listing Rule, as Ormat's success in this lawsuit would, at the very least, lead to significant development and consequential environmental impact to the toad's habitat, while a successful defense would redress that potential injury by preventing it. Thus, the Court finds that Defendant-Intervenors' members have standing to sue in their own right.

Second, Defendant-Intervenors must show that the interest they seek to protect is germane to their purposes. The Center has a long history of litigating to protect the environment. Donnelly Decl. ¶ 6. Alongside its litigation arm, the Center also advocates in the defense of endangered species and at-risk habitats by conducting government oversight and providing educational materials to the public. *Id.* ¶ 9. The Center is "dedicated to environmental protection" of the Dixie Meadows and the Listing Rule protects that interest. Mot. at 18–19, n.2.

Regarding the Tribe's purpose, they have historically referred to themselves as "Cattail-eaters," because they have "always based [their] way of life on the marshes and springs within [their] vast ancestral territory[.]"  Williams-Tuni Decl. ¶ 5.  For generations, the Tribe has utilized the Dixie Meadows for healing, spiritual contemplation, and ceremonies.  *Id.* ¶ 9.  The Tribe views the toad as an "inextricable element of the Dixie Meadows springs and [to] the Tribe's culture" and the toad's protection is linked to the preservation of their sacred sites.  *Id.* ¶¶ 8, 16.  Therefore, Defendant-Intervenors' interests are germane to their purposes.

Finally, Defendant-Intervenors must show that neither the claim asserted, nor the relief requested requires the Defendant-Intervenors' members to participate in the lawsuit.  It is unnecessary for individual members to be named as defendants and nothing in the suit requires individual members to participate in the suit.  Mot. at 18–19, n.2.  Therefore, Defendant-Intervenors have associational standing in this case.

## B.  Intervention as of Right

Having met the requirements for standing, the Court's analysis of the Rule 24(a) requirements for intervention as of right is straightforward.  First, the motion to intervene was timely filed.

> Timeliness "is to be judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case."

*Amador Cty. v. U.S. Dep't of Interior*, 772 F.3d 901, 903 (D.C. Cir. 2014) (quoting *United States v. British Am. Tobacco Austl. Servs., Ltd.*, 437 F.3d 1235, 1238 (D.C. Cir. 2006)).  Defendant-Intervenors' motion to intervene was filed on January 13, 2026, before Federal Defendants even filed an Answer to the Complaint.  *See* Mot. at 1.  Neither party has argued that they will be prejudiced by Defendant-Intervenors' participation in the suit, nor that responding to their

8

briefings will unduly disrupt or delay the litigation. *See* Federal Defs.' Resp at 1; Ormat's Resp. at 1. Thus, this Court finds that the motion to intervene is timely.

Further, this Court finds that Defendant-Intervenors have demonstrated a legally protected interest under Rule 24(a) and that an adverse action by this Court could impair or impede that interest. When a prospective intervenor "has constitutional standing, it *a fortiori* has 'an interest relating to the property or transaction which is the subject of the action.'" *Crossroads*, 788 F.3d at 320 (quoting *Fund for Animals v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003)); *see also Safari Club Int'l v. Salazar*, 281 F.R.D. 32, 38 (D.D.C. 2012) ("The injury-in-fact and causation connection with the challenged action requirements for standing are closely related to the second and third factors under Rule 24(a) . . . .").

Finally, the Court agrees that Federal Defendants might not adequately represent the interests of Defendant-Intervenors. The adequate representation requirement "is satisfied if the applicant shows that representation of his interest 'may be' inadequate." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). "[T]he burden of making that showing should be treated as minimal." *Id.* Here, Defendant-Intervenors seek to defend the existing federal protections from the Listing Rule to ensure the safety and sanctity of the toad and the Dixie Meadows. Mot. at 12. Presumably, Federal Defendants have an interest in defending BLM's decision-making process regarding the Project's approval in the Dixie Meadows, and for the benefit of the American people broadly. *See* Mot. at 30–31; *Am. Horse Prot. Ass'n, Inc. v. Veneman*, 200 F.R.D. 153, 159 (D.D.C. 2001) (concluding the Department of Agriculture may not adequately represent a non-profit organization when the agency was charged with balancing a "broad spectrum of interests . . . includ[ing] the general public[.]"). While similar, Defendant-Intervenors have interests that are narrower than Federal Defendants'. "We have often

concluded that governmental entities do not adequately represent the interests of aspiring intervenors."  *Fund for Animals*, 322 F.3d at 736.  "[T]here may be a partial congruence of interests, [but] that does not guarantee the adequacy of representation."  *Id.* at 737; *see also Am. Horse Prot. Ass'n, Inc.*, 200 F.R.D. at 159 (sharing a "general interest in the legality of a program or regulation does not mean their particular interests coincide so that representation by the agency alone is justified.").  Because this Court finds that it is not clear that Federal Defendants share Defendant-Intervenors' interests, Defendant-Intervenors have satisfied the final element of Rule 24(a).

## V.  CONCLUSION

For the foregoing reasons, the Center for Biological Diversity and Fallon Paiute-Shoshone Tribe's Motion to Intervene (ECF No. 8) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 20, 2026                                          RUDOLPH CONTRERAS
                                                                United States District Judge